IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No: 3:19-cr-00277-JFA |
| vs. | |
| | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **HERB KIMBLE** | |

On April 4, 2019, Defendant Herb Kimble travelled from the Philippines to the United States and pled guilty to his role in a healthcare fraud conspiracy. But for Mr. Kimble's voluntary travel to the United States, Mr. Kimble's plea would not have been entered because the Government would not have been able to extradite him from the Philippines. Pursuant to his plea agreement Mr. Kimble agreed, among other things, to cooperate fully with the Government, agreed to voluntary surrender his interests in various medical equipment and related companies, and agreed to pay $40,000,000 towards restitution. In exchange for his acceptance of responsibility and cooperation, the Government agreed to a stipulated sentence under Federal Rule of Criminal Procedure 11(C)(1)(c) of probation. Further, the Government agreed that Mr. Kimble's probation would terminate upon his $40,000,000 payment towards restitution and that Mr. Kimble would cooperate for five years following sentencing.

The Government submits this memorandum requesting that the Court accept the 11(C)(1)(c) plea agreement in this case. Mr. Kimble's crimes were serious, and he will be forever a felon, divested of tens of millions of dollars, and be barred from working in the U.S. healthcare industry. Further, Mr. Kimble is a uniquely situated and exceedingly rare defendant because the Government would not have been able to successfully prosecute him at all had he not voluntarily come to the United States to enter a plea. As a result, Mr. Kimble's expansive cooperation was

directly responsible for the uncovering and prosecution of one of the largest healthcare fraud schemes in the history of the United States resulting in hundreds of millions in restitution ordered in cases throughout the country.

I.     BACKGROUND.

The Presentence Report (PSR) in this case lays out the facts in some detail, and the Government generally agrees with those background factual summaries[1] and thus limits this background section to those bearing directly upon Mr. Kimble's sentencing.

*The Overall Scheme*

Approximately five years ago, the Federal Bureau of Investigation (FBI) and the U.S. Department of Health and Human Services Office of the Inspector General (HHS-OIG) began investigating allegations of healthcare fraud in the telemedicine industry. The gravamen of the scheme involved the payment of illegal kickbacks by Durable Medical Equipment (DME) companies in exchange for the referral of Medicare beneficiary information by medical professionals working with fraudulent telemedicine companies for back, shoulder, wrist and knee braces that were medically unnecessary, not provided as represented, and not eligible for reimbursement.

The scheme generally worked as follows: various call centers would recruit beneficiaries using commercials targeting Medicare beneficiaries with promises of low-to-no-cost braces. Once

---

[1] The Government would note that the Guidelines calculation range is the PSR is based on a loss figure between $25 million and $65 million; however, as set forth in the plea agreement, at the time Mr. Kimble plead, the readily provable loss was between $3.5 million and $9.5 million. However, given that the Government is seeking approval of the stipulated sentence, it is focusing its argument on the appropriateness of accepting that plea. The Government would also note that the restitution figure set forth in the PSR appears to be based on the plea agreement's provision that states: "[t]he Defendant further agrees to pay $40,000,000.00 ($40 million) in restitution at sentencing towards his anticipated restitution obligation."

a beneficiary called the number provided on the advertisement, their personal information would be obtained, they typically would be pressured to accept multiple braces, and then the beneficiary's information would be sent to a telemedicine company. The telemedicine company would arrange for a doctor to sign a prescription for DME and send it back to the call center. The entire packet, called a completed doctor's order, would then be sold to a DME company (or to purported marketers who resold the orders to DME companies). The DME company in turn billed Medicare for the brace, based on the completed doctor's order the DME company paid for with illegal kickbacks and bribes. A drop-ship company that contracted with manufacturers would then send the brace to the beneficiary. The fee per completed doctor's order was disguised on invoices as payment for "marketing" and "processing" instead of payment for a beneficiary's information. These deceptive invoices and sham contracts were utilized to conceal the illegal nature of the kickback payments from the DME companies to the call centers.

Put simply, the scheme involved purchasing patients and signed prescriptions for DME companies. The purchased patients and doctors' orders were used to bill Medicare for braces. The investigation revealed that Mr. Kimble was a primary architect of the scheme. From his home in the Philippines, he would procure patients through his marketing companies and off-shore call centers, procure signed prescriptions through telemedicine companies, and effectively sell those signed prescriptions and patients to the various DME companies – whose true owners were oftentimes hidden through various nominee owners – so the companies could continue to bill Medicare, even after their billing practices were scrutinized or audited by regulators.

### *Kimble's Voluntary Disclosure to the Government*

In approximately August 2017, the Government approached a true DME company owner (rather than the person falsely reflected on enrollment documents) to discuss his potential role in

3

the scheme. At the time, this was the only DME company the Government was aware of. The DME company owner did not initially cooperate[2], and instead informed his business partner, Mr. Kimble, that federal authorities were investigating the DME company.

Just after Christmas 2017, as the Government was building its case against the DME company and its true owner, Mr. Kimble approached the Government through counsel. The Government had at no point prior approached Mr. Kimble, and at the time the Government could only show Mr. Kimble was running a call center that could be tied to the single DME company under investigation with Medicare-related kickbacks of approximately $8 million. Mr. Kimble was based in the Philippines, and discussion with the Department of Justice's (DOJ's) Office of International Affairs revealed that the Philippines would not extradite for healthcare-based offenses. This further hampered the ability of the Government to stop the fraud occurring in the Philippines or seize any money in the Philippines without Mr. Kimble's agreement to do so.

Agreeing to keep all resolutions on the table, the Government and Mr. Kimble ultimately entered into a proffer agreement. As is standard in all proffer agreements with the Government in this District, the Government agreed not to use any information Mr. Kimble provided against him with limited exceptions. Mr. Kimble initially provided a list of hundreds of DME companies tied directly to him and his marketing companies and engaged in a lengthy proffer session overseas. Since then, Mr. Kimble provided detailed information about the scheme, prepared to testify at trials, did testify in one trial, and surreptitiously recorded targets of the various investigations, including owners of DME companies, telemedicine companies, and at least one international money launderer during covert meetings in multiple states. This cooperation has placed Mr.

---

[2] This DME company owner later retained new counsel, and the DME company owner then cooperated. He has since been indicted in a related case and awaits sentencing before this Court.

Kimble and his family at great risk. Mr. Kimble also provided a forensic image of his companies' servers which contained information including recorded telephone calls, screenshots of his online portal, and prescriptions amounting to more than 70 Terabytes of data relevant to numerous investigations across the United States. The volume of information was so large that DOJ had to employ a third-party contractor simply to house the information. It was primarily because of Mr. Kimble's information and efforts that the Government was able to turn the case into the coordinated law enforcement action it now calls Operation Brace Yourself, one of the largest healthcare fraud prosecutions of its kind.

Throughout this process, plea negotiations were ongoing. In early 2019, this District's leadership at the time, along with certain other agencies involved in the investigation, agreed that given the inability to extradite Mr. Kimble, coupled with his overwhelming cooperation, it would be appropriate to offer Mr. Kimble a stipulated plea to probation.

### *Kimble's Efforts Quantified*

Given the scope of Mr. Kimble's efforts, it is difficult to precisely quantify his assistance as some of the cases are still ongoing. Nonetheless, the Government can offer the following quantification of Mr. Kimble's substantial efforts:

Previous Trial Testimony

- *U.S. v. Hagen*, 3:19-cr-00146 (N.D. Texas)
    - Status: Both defendants convicted and sentenced to 151 months' imprisonment

Upcoming Trial Testimony[3]

- *U.S. v. O'Hara*, 5:19-cr-00231 (W.D. Texas)

---

[3] The Government understands this Court's previous discussions about the need to move this case, is not seeking any further delay in sentencing, and defers to the Court as to timing. Based on representations from defense counsel, the Government anticipates Mr. Kimble will return to the United States to testify in these trials as needed.

- o  <u>Status</u>: He is anticipated to testify at this trial, which was recently rescheduled to March 20, 2023

- *U.S. v. Harry*, 2:19-cr-00246 (D.N.J.)

  - o  <u>Status</u>: He is anticipated to testify at this trial, which likely will be scheduled for trial in February 2023

- *U.S. v Bell*, 3:20-cr-2887 (S.D. Calif.)

  - o  <u>Status</u>: He is anticipated to testify at this trial, which is scheduled for January 31, 2023

<u>Summary of All Cases</u>[4]

- **Total Defendants Charged in Connection with Mr. Kimble's Cooperation**: Approximately 80 Defendants have been charged across 21 judicial districts.

- **Total Restitution Ordered to Date**: $385,781,940.75. This number does not include the restitution that will be paid by Mr. Kimble and the DME company owner due to be sentenced before the Court, the more than $500,000 fines ordered to be paid in these cases, the value of some companies and accounts that were forfeited during the investigation, and restitution from the numerous defendants whose cases are still pending.

## II.  ACCEPTING THE STIPULATED SENTENCE IS APPROPRIATE IN THIS CASE.

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[5] In order to determine the "particular" sentence to impose, the Court must consider the familiar statutory

---

[4] The Government is providing a list of cases and information in its possession to the Court *in camera*, as many of these cases are sealed and contain other potentially sensitive information. The Government would be able to provide a more sanitized list for filing if necessary.

[5] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

factors listed in §3553(a)(1)-(7). Here, as explained below, the Section 3553(a) factors weigh in favor of accepting the stipulated sentence in the plea agreement for two primary reasons: (1) because Mr. Kimble could not be extradited from the Philippines, he is only subject to prosecution at all based on his willingness to accept the guilty plea in this case; and (2) Mr. Kimble's assistance is among the most substantial in any healthcare fraud case to date in the District (and likely the country).

### A.     Nature of Offense and History and Characteristics of Defendant – §3553(a)(1).

There is no doubt that Mr. Kimble's crimes are serious. He was the architect of a substantial and international healthcare fraud scheme. However, before Mr. Kimble agreed to proffer, the Government could prove, at best, an approximate $8 million kickback scheme involving a single DME company. Mr. Kimble's information made the Government aware of the existence of this nationwide and international scheme.

Regarding his history and characteristics, Mr. Kimble has a Criminal History Score of zero. Further, as discussed more thoroughly herein, Mr. Kimble could have simply stayed in the Philippines, kept his ill-gotten gains, and continued his illegal businesses. Instead, before ever being approached by the Government, he voluntarily agreed to cooperate and did so by wearing a wire, testifying, providing critical data, and relinquishing his various companies and the money he made from the scheme.

As a direct result of his cooperation, not only was the Government able to charge a substantial number of defendants to date, but his efforts also led directly to the Government's ability to attack one of the largest healthcare fraud schemes in the history of the United States. On balance, the nature of the offense and the history and characteristics of Mr. Kimble show that accepting the stipulated sentence is appropriate in this case.

> **B.** **Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense – §3553(a)(2)(A); Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct – §3553(a)(2)(B); and Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant – §3553(a)(2)(C).**

The stipulated sentence is serious and provides serious punishment in this case. Mr. Kimble did not get immunity, he will forever be a felon, and he will lose the money he profited in the scheme. All this punishment was voluntary by Mr. Kimble because, as stated numerous times herein, the Government could not extradite Mr. Kimble or seize his assets from the Philippines.

Regarding deterrence and protecting the public from future crimes, he likely will be excluded from participation in the Medicare program and this prosecution has already deterred others who would have engaged in similar fraud schemes. "[T]he Operation Brace Yourself Telemedicine and Durable Medical Equipment Takedown alone resulted in an estimated cost avoidance of more than $1.9 billion in the amount paid by Medicare for orthotic braces in the 20 months following that enforcement action." *See Justice Department Charges Dozens for $1.2 Billion in Health Care Fraud*, DOJ (July 20, 2022), available at https://www.justice.gov/opa/pr/justice-department-charges-dozens-12-billion-health-care-fraud. That Mr. Kimble will face conviction and be divested of $40 million will certainly act as a continued deterrence and further protect the public.

> **C.** **Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct – §3553(a)(6); and Need to Provide Restitution to any Victims of the Offense – §3553(a)(7).**

Accepting the stipulated sentence will not create unwarranted sentencing disparities and will allow Mr. Kimble to pay at least $40 million towards restitution. Although the chart submitted *in camera* shows at least three defendants in related cases with multi-million-dollar kickback

amounts received sentences of probation, the Government acknowledges that most defendants in related or similar cases with substantial kickbacks have received custodial sentences. The Government further acknowledges that it typically requests custodial sentences in white collar cases. However, Mr. Kimble is among the more unique defendants to have appeared before this Court, and his case cannot be separated from its context and must be judged according to its own exceptional facts.

First, the stark reality is that defendants who are truly similarly situated to Mr. Kimble are rarely convicted at all. That is because most defendants with substantial financial resources who live in countries from which they cannot be extradited never come to the United States to face prosecution. The Government's choice as to Mr. Kimble was a binary one: obtain a conviction with probation, significant restitution, and substantial cooperation; or get nothing beyond what we had already developed against the U.S.-based defendants nearly five years ago.

Second, the level and efficacy of Mr. Kimble's cooperation is difficult to overstate and is comparable to few, if any, defendants in any healthcare fraud case. It is a rare that one cooperator is substantially responsible for the prosecution of more than 80 defendants charged across 21 judicial districts, nearly $2 billion in Medicare cost avoidance, and nearly $400,000,000 in restitution (some of which is joint and several) from judgments across the country.[6]

---

[6] Mr. Kimble's agreement to pay $40 million towards restitution is but one of the many factors that weigh in favor of the stipulated sentence. *See United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996) ("Thus, restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual.'").

Thus, in this rare and peculiar case, a sentence of probation would avoid sentencing disparities and provide restitution.

## III. CONCLUSION.

Mr. Kimble could have avoided prosecution and, instead, pled guilty to a felony, agreed to pay tens of millions towards restitution, and provided the cooperation necessary to dismantle one of the largest healthcare fraud schemes in the history of the United States. For the reasons discussed herein, a stipulated sentence of probation would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

RESPECTFULLY SUBMITTED,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

BY:  /s/ *Derek A. Shoemake*
  Derek A. Shoemake (Fed. Id. 10825)
  Assistant U.S. Attorney
  401 West Evans Street, Room 222
  Florence, South Carolina 29501
  (843) 665-6688
  Derek.Shoemake@usdoj.gov

BY:  /s/ *Amy Bower*
  Amy F. Bower (Fed. Id. 11784)
  Assistant U.S. Attorney
  151 Meeting Street, Suite 200
  Charleston, South Carolina 29401
  (843) 727-4381
  Amy.Bower@usdoj.gov

Columbia, S.C.
October 14, 2022